Corrected

# In the United States Court of Federal Claims

No. 26-451
Filed under seal: April 3, 2026
Reissued: April 14, 2026
NOT FOR PUBLICATION*

| |
|---|
| **ASRC FEDERAL INFRASTRUCTURE SUPPORT, LLC** |
| *Plaintiff,* |
| **v.** |
| **UNITED STATES,** |
| *Defendant,* |
| **and** |
| **DAWSON MCG, LLC,** |
| *Defendant Intervenor.* |

*Damien C. Specht, James A. Tucker, Joseph A. Ward, Kang Il T. Lee*, Morrison & Foerster LLP, Washington, DC, for the plaintiff.
*W*
*Reta E. Bezak.* Department of Justice, Civil Division, Washington, DC, for the defendant.

*Johnathan M. Bailey*, *Kristin E. Zachman*, Cokinos Young, San Antonio, TX, for the defendant-intervenor.

## MEMORANDUM OPINION

***HERTLING*, Judge**

The plaintiff, ASRC Federal Infrastructure Support, LLC ("AFIS"), brings this bid protest against the defendant, acting through the Department of Homeland Security ("DHS"), challenging the award of two contracts to the intervenor, Dawson MCG, LLC ("Dawson"), under

---

* Pursuant to the protective order in this case, this opinion was filed under seal on April 3, 2026, and the parties were directed to propose redactions of confidential or proprietary information by April 13, 2026.  The parties proposed redactions, which are all accepted and denoted by [* * *]. This public opinion also includes other minor edits.

28 USC § 1491(b).  The contracts are to provide student-support and facilities-operation services at DHS's Federal Law Enforcement Training Center ("FLETC") in Charleston, South Carolina.

AFIS has moved for a preliminary injunction to block the early transition of the contract from the current provider of the services, AFIS's affiliated company, ASRC Federal Field Services, LLC ("AFFS").  AFFS's current contracts were to end on March 31, 2026.  AFIS filed this protest on March 20, 2026, challenging the awards to Dawson.  DHS refused to stay the termination of AFFS's contracts and the transition to Dawson.

## I.    FACTUAL BACKGROUND

On February 27, 2025, DHS issued a single solicitation for two distinct contracts: Student Services (RFP No. 70LCHS25RPFB00001) and Facilities Operation Maintenance (RFP No. 70LCHS25RPFB00002) to support operations at FLETC.  AR Tab 1z at 876; AR Tab 1za at 986; AR Tab 1a at 68; AR Tab 1x at 863.

The solicitation was issued as a competitive 8(a) set-aside acquisition.  AR Tab 1a at 68. The solicitation provided for a best-value tradeoff using a two-phase advisory down-selection evaluation.  AR Tab 1zm at 1170; AR Tab 1zn at 1184.  Phase I consisted of Factor 1, Demonstrated Prior Experience.  AR Tab 1zo at 1193; AR Tab 1zp at 1199.  Phase II consisted of Factor 2, Oral Presentation; Factor 3, Capability of Key Personnel; Factor 4, Past Performance; and Factor 5, Price Proposal.  AR Tab 1zo at 1193; AR Tab 1zp at 1199.  The Non-Price/Cost factors were of equal importance and, when combined, were significantly more important than Cost/Price.  AR Tab 1zo at 1194; AR Tab 1zp at 1200.  The solicitation specified that DHS would "not make an award at a significantly higher overall price to achieve only slightly better performance capabilities."  AR Tab 1zo at 1194; AR Tab 1zp at 1200.

DHS was to evaluate Factor 1, Demonstrated Prior Experience, based on an offeror's prior experience with and knowledge of the performance work statement ("PWS") requirements. AR Tab 1zo at 1194; AR Tab 1zp at 1200.  DHS was to consider prior experience that was similar in scope and complexity of the requirements of these two contracts.  *Id*.

Factor 2, Oral Presentations, would be assessed on the "level of confidence that the offering contractor will successfully perform all requirements in regards to the technical approach and management approach."  AR Tab 1zo at 1194; AR Tab 1zp at 1200.  The oral presentations also included responses to three questions provided prior to the oral presentation and five situational questions asked during the oral presentation.  AR Tab 1zo at 1194-95; AR Tab 1zp at 1200-01.  DHS was also to consider matters such as the offerors' technical approach, management and operation of facilities, and quality and quantity of the proposed labor force.  *Id*.

Under Factor 3, Capability of Proposed Key Personnel, DHS would evaluate the strength of the key personnel proposed, including their educational qualifications, relevant experience, and recognition as respected leaders in their field.  AR Tab 1zo at 1195; AR Tab 1zp at 1201.

Under Factor 4, Past Performance, DHS would evaluate offerors' recent and relevant performance of projects of similar size, scope, and complexity completed during the past five years.  AR Tab 1zo at 1195; AR Tab 1zp at 1201.  Offerors were to demonstrate satisfactory performance of relevant services like those in the solicitation.  *Id*.  Past performance was

evaluated on the following factors: capable and committed adequate resources to perform efficiently and effectively; performance conformed to the contract; work performed on schedule at reasonable cost; and effective management of the workforce and maintenance of good business relations.  AR Tab 1zo at 1196; AR Tab 1zp at 1202.

For each contract, DHS evaluated Factors 1 through 3 as follows:

| Rating | Definition |
| --- | --- |
| High Confidence | The Government has high confidence that the offeror understands the requirement, proposes a sound approach, and will be successful in performing the work. |
| Some Confidence | The Government has some confidence that the offeror understands the requirement, proposes a sound approach, and will be successful in performing the work. |
| Low Confidence | The Government has low confidence that the offeror understands the requirement, proposes a sound approach, or will be successful in performing the work. |

AR Tab 1zo at 1197; AR Tab 1zp at 1203.

DHS would evaluate Factor 4 based on a four-level confidence rating system, as follows:

| Rating | Definition |
| --- | --- |
| High Confidence | Based on the Offeror's recent (within 5 years) and relevant (similar in magnitude and scope of this effort) performance record, the Government has a high expectation that the Offeror will successfully perform based on the offeror's performance. |
| Some Confidence | Based on the Offeror's recent (within 5 years) and relevant (similar magnitude and scope of this effort) performance record, the Government has a reasonable expectation that the Offeror will successfully perform based on the offeror's performance. |
| Neutral | The Offeror does not have recent (within 5 years) and relevant (similar in magnitude and scope of this effort) performance; or the Offeror's performance record is so sparse, a meaningful confidence rating cannot be reasonably assigned. This rating is neutral, neither favorable or unfavorable. |
| Low Confidence | Based on the Offeror's recent (within 5 years) and relevant (similar in magnitude and scope of this effort) performance record, the |

| | Government has a limited expectation that the Offeror will successfully perform based on the offeror's performance. |

AR Tab 1zo at 1198; AR Tab 1zp at 1204.

DHS would evaluate Factor 5, price, based on an offeror's total evaluated price, including all option periods, for "accuracy, realism, reasonableness and completeness." AR Tab 1zo at 1196; AR Tab 1zp at 1202. For evaluation purposes, DHS would calculate total evaluated price by adding the total price for the base period and all options, including the six-month option under FAR 52.217-8. AR Tab 1zo at 1197; AR Tab 1zp at 1203.

Factors 1-4 of both procurements were of equal weight and, together, were far more important than price. AR Tab 1zo, PI Appx 1194; AR Tab 1zp, PI Appx 1200.

**Initial Evaluations of AFIS and Dawson**

DHS concluded that AFIS proposed the offer with the lowest evaluated price, which was approximately [* * *] percent lower than the Independent Government Estimate ("IGE"). AR Tab 13 at 2961. AFIS received a High Confidence rating for Factor 1, a Some Confidence rating for Factor 3, and Low Confidence ratings for Factors 2 and 4. *Id*. AFIS received the lowest evaluation ratings for Factors 2 and 4 (Low Confidence) of all offerors. *Id*. In summarizing AFIS's oral presentation, the evaluators concluded that AFIS had failed to utilize its familiarity with the contract as the incumbent and did not provide "specific methods or assurances that would deliver real benefits or added value to the government."[1] *Id*.

AFIS's Past Performance submission (Factor 4), received a Low Confidence rating. DHS noted that it had addressed multiple issues with AFFS on the incumbent contract. *Id*. DHS also noted that AFIS had received marginal Contract Performance Assessment Reporting System ("CPARS") ratings on the incumbent contract, and that FLETC had encountered consistent issues with preventive maintenance records and deliverables under the incumbent contract, highlighting AFFS's performance gaps. DHS observed that AFIS had received multiple Letters of Concern and Corrective Action Reports in support of contracts referenced within its past performance submission. *Id*. Given these weaknesses, DHS concluded that the value of AFIS's proposal was not worth the trade-off of its lowest price. *Id*. at 2962.

Alternatively, Dawson proposed the highest evaluated price. *Id*. In evaluating Factor 1, DHS concluded that Dawson had demonstrated relevant experience providing support for various government facilities that are all larger in size, scope and complexity than the FLETC contract requirements. *Id*. at 2963. DHS found Dawson's staffing plan to be superior, given the problems it had encountered with AFFS's staffing levels under the incumbent contract. *Id*. Dawson's proposal also detailed how it would implement comprehensive maintenance programs and utilize its experience to improve facility support. *Id*.

---

[1] As noted above, the incumbent is not AFIS but its affiliate AFFS.

For the student-services contract, DHS noted that AFIS demonstrated several strengths, including thorough responses from well-prepared subject-matter experts and strong institutional knowledge as the incumbent.  AR 17 at 2987.  DHS also concluded, however, that AFIS's offer lacked clarity, and that proposed value-added items largely overlapped with existing PWS requirements.  *Id*.  The evaluators found that AFIS had made misrepresentations regarding past program creation and failed to leverage its institutional knowledge as the incumbent.  *Id*.  The evaluators noted specifically that AFIS had claimed "no loss of weapons, despite documented incidents of unaccounted weapons."  *Id*.  DHS also found that critical operational requirements were missing from the offer, and that key personnel lacked the required experience.  The evaluators did not find any significant strengths that would increase the value of the government in return for the lower price.  *Id*. at 2988.

Alternatively, Dawson again proposed the highest evaluated price.  *Id*. at 2988.  The evaluators noted that Dawson proposed a fully qualified list of key personnel who met or exceeded all minimum qualifications, and that Dawson's proposal included a fleet of vehicles.  *Id*.  DHS found that Dawson's proposal reflected expertise that Dawson can leverage to "maintain continuity in training operations, prevent gaps in ammunition management, and support uninterrupted training schedules."  *Id*.  DHS concluded that Dawson's higher evaluated price was worth the premium "[b]ased on Dawson's cumulative technical evaluation . . . [c]ombined with the[ ] confidence rating for factors 1-4."  *Id*. at 2989.

**Award of Contracts**

On July 8, 2025, DHS notified AFIS that its proposal was unsuccessful and that both contracts had been awarded to Dawson.  AFIS protested the award to the Government Accountability Office ("GAO").  AR Tab 2 at 1207.  DHS announced on August 14, 2025, that it would take corrective action, and GAO dismissed the protest.

On March 5, 2026, ASRC Federal Operating Group president Michael Manzo spoke by telephone with David Johnson, President and CEO of Dawson.  (ECF 1 at Ex. A, ¶ 3.)[2]  Mr. Johnson told Mr. Manzo that Dawson had been negotiating with DHS since March 2, 2026, to work out the details of the award to Dawson.  (*Id*. at ¶ 7.)  Mr. Johnson also told Mr. Manzo of a memorandum that he had not seen but heard required that all DHS contracts held by ASRC federal-related companies be terminated by March 6, 2026.  (*Id*. at ¶¶ 4-5.)

On March 6, 2026, DHS informed AFIS that both contracts had again been awarded to Dawson, and on that same day AFIS filed an agency-level protest, objecting to the pre-award negotiations with Dawson, the change of scope in the contracts based on these negotiations, and the apparent influence of the DHS memorandum referenced by Mr. Johnson on both the award and the alleged change in scope of the contracts.  On March 11, DHS informed AFIS that it had overridden the stay of performance triggered by the agency-level protest.  AFIS was also told that DHS would delete the option periods from the incumbent contract, thereby changing the end

---

[2] This exhibit, a declaration by Mr. Manzo, is not in the administrative record.  It is referenced here only to provide factual background and is not relied on for any aspect of the decision aside from consideration of a possible remedy.

of the contract from July 31, 2026, to March 31, 2026.  DHS executed that modification two days later

.

**Post-Award Debriefing**

On March 12, 2026, DHS provided AFIS with a post-award debriefing for both contracts.

DHS's post-corrective action evaluations of the two offers for the student-services contract were as follows:

| Offeror | Factor 1 – Demonstrated Prior Experience | Factor 2 – Oral Presentation | Factor 3 – Capability of Proposed Key Personnel | Factor 4 – Past Performance | Evaluated Price |
|---|---|---|---|---|---|
| Dawson | Some Confidence | High Confidence | High Confidence | High Confidence | [* * *] |
| AFIS | High Confidence | Some Confidence | Some Confidence | Low Confidence | [* * *] |

AR Tab 17 at 2986-87.

DHS's evaluations of the two offers for the facilities-operations contract were as follows:

| Offeror | Factor 1 – Demonstrated Prior Experience | Factor 2 – Oral Presentation | Factor 3 – Capability of Proposed Key Personnel | Factor 4 – Past Performance | Evaluated Price |
|---|---|---|---|---|---|
| Dawson | High Confidence | High Confidence | High Confidence | High Confidence | [* * *] |
| AFIS | High Confidence | Low Confidence | Some Confidence | Low Confidence | [* * *] |

AR Tab 13 at 2960-61.

## II.    PROCEDURAL HISTORY

AFIS filed its complaint on March 20, 2026.  (ECF 1.)  The complaint raises five counts. Count I alleges that the agency's evaluation of proposals under factor 2 of the student-services procurement was arbitrary and capricious; count II alleges the agency's evaluation of proposals under factor 2 of the facilities procurement was arbitrary and capricious; count III alleges the agency's evaluation of proposals under factor 4 was arbitrary and capricious; count IV alleges the agency violated regulations by awarding the contracts for requirements that differed from those solicited and conducting negotiations only with Dawson concerning the changed requirements; and count V alleges the best-value tradeoff analyses were arbitrary and capricious and based on flawed underlying evaluations.  For relief, AFIS seeks, among other things, a preliminary injunction prohibiting DHS from proceeding with performance pending the outcome of the protest and a permanent injunction blocking DHS from proceeding with performance of the awards and from proceeding with new award decisions until it has reevaluated proposals in a fair and consistent manner, in accordance with the terms of the solicitation.

Having learned that DHS would not stay award or performance of the contracts, AFIS filed a motion for a preliminary injunction on March 27, 2026, seeking to block transition and performance of both contracts until the protest is resolved.  On March 31, 2026, the defendant and the defendant-intervenor filed their responses to the motion (ECF 28; ECF 29), and on April 1, 2026, the plaintiff filed its reply (ECF 30) to the responses.  Oral argument was held on April 2, 2026, and an oral ruling was issued at the conclusion of the argument, and an order denying the motion was filed.  This opinion memorializes and explains the rationale for the oral ruling.

## III.    JURISDICTION AND STANDING

The Court of Federal Claims has jurisdiction over "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).

AFIS challenges DHS's award of the student services and facilities contracts to Dawson, alleging that DHS improperly evaluated its proposal and that DHS improperly held discussions with Dawson.  AFIS alleges it was prejudiced by DHS's errors.  Accordingly, AFIS's claims fall within the court's bid-protest jurisdiction.

For a plaintiff to have statutory standing in a bid protest, it must be an "interested party." 28 U.S.C. § 1491(b)(1); *see CACI, Inc.- Fed. v. United States*, 67 F.4th 1145, 1152 (Fed. Cir. 2023).  To qualify as an interested party, an offeror must allege facts, that, if true, "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006); *see also Percipient.ai, Inc. v. United States*, 153 F.4th 1226, 1235 (Fed. Cir.), *cert. denied* 2026 WL 79975 (2026).

In determining whether a protestor has alleged facts demonstrating the "requisite direct economic interest," a court must decide whether those alleged facts show the protestor was prejudiced by the alleged errors.  *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996).  To establish prejudice for standing purposes in a post-award bid protest, the protestor's

complaint must "show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (citation omitted)). To determine whether it has standing, a protester's allegations are assumed to be true. *See Am. Relocation Connections, LLC v. United States*, 789 F. App'x 221 (Fed. Cir. 2019).

AFIS is an actual bidder for the student services and facilities contracts. Assuming its allegations to be true, AFIS, as the lowest bidder and provider of services on the predecessor contracts, would have had a substantial chance of receiving the contract award if it can prove DHS made the errors alleged. As a result, the plaintiff has satisfied the requirements for standing.

## IV.    STANDARD FOR AWARD OF A PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The purpose of a preliminary injunction in a bid protest is to preserve the status quo pending resolution of the case on the merits. *See Cont'l Serv. Grp., Inc. v. United States*, 722 F. App'x 986, 994 (Fed. Cir. 2018).

The party seeking a preliminary injunction bears the burden of establishing four factors to obtain this extraordinary remedy. First, the moving party must establish that it is likely to succeed on the merits. A plaintiff may not be granted preliminary relief "unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (emphasis in original); *see also Sumecht NA, Inc. v. United States*, 923 F.3d 1340, 1348 (Fed. Cir. 2019). If the moving party has shown a likelihood of success on the merits, it must also show that it will suffer irreparable harm without preliminary injunctive relief. Third, the balance of equities must tip in the moving party's favor. Fourth, a preliminary injunction must be in the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

## V.    DISCUSSION

### A. Likelihood of Success on the Merits

To demonstrate likelihood of success on the merits, AFIS must show that it is "more likely than not" to succeed on its claims that DHS's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706); *Veterans Contracting Grp., Inc. v. United States*, 133 Fed. Cl. 613, 621 (2017). AFIS need only raise "serious questions over [DHS]'s evaluation of proposals in this procurement" by, for example, "point[ing] to inconsistencies, omissions, unequal treatment of offerors, and cherry-picked data." *FMS Inv. Corp. v. United States,* 136 Fed. Cl. 439, 443 (2018).

The plaintiff attempts to demonstrate it will be likely to succeed on the merits by arguing DHS misevaluated AFIS and/or Dawson under each of the five solicitation factors. The plaintiff prevails on its initial argument regarding Dawson's proposal and DHS's evaluation of the Dawson team, and this claim therefore leads the analysis.

### 1.  FACTORS 1 AND 4[3]

*Dawson's evaluation*

AFIS argues that DHS improperly credited Dawson with high confidence under Factors 1 (Demonstrated Prior Experience) and 4 (Past Performance) of its proposals for both the student services and facilities-operations contracts.  It contends that DHS erroneously rated Dawson based on various experiences performed by affiliates of Dawson, rather than by Dawson itself.  Citing Judge Bruggink's decision in *Advanced Management Strategies Group, Inc. v. United States*, 139 Fed. Cl. 404, 417 (2018), AFIS argues that it is arbitrary and capricious to credit an offeror for the past performance of its affiliates unless the proposal explains how those affiliates will be specifically involved in the contract's performance.

As Chief Judge Solomson explained last week, a proposal that relies on affiliates both to perform responsibilities under the contract and to satisfy the requirement to demonstrate successful past performance must detail the tasks and share of the work any affiliate will perform, outline any intra-corporate agreements, and explain the resources any affiliate will contribute and the oversight and accountability mechanisms in place.  *Noblis MSD, LLC v. United States*, Case No. 25-1637C, slip op. at 49, 2026 WL 851951, at * 24-25 (Fed. Cl. March 25, 2026).  Here, AFIS claims that Dawson's proposal only vaguely references its affiliates without identifying how any of them will participate in contract performance.  In addition, Dawson's offers for both contracts rely on the past performance of its affiliates for support without identifying the role any of the affiliates will play in fulfilling the responsibilities of these contracts.  AFIS argues that given these shortcomings, the reliance on affiliates to support Dawson's past performance is inadequate, and DHS's rating of high confidence for Dawson's past performance is arbitrary and capricious.

The defendant responds by highlighting that Dawson's proposal explicitly noted that the combined experience, past performance, and resources of the entire Dawson enterprise, including affiliates and the parent company, are being offered to fulfill the contract.  Tab 6c, PI Appx 2191.  The defendant also points to Dawson's oral presentation, during which team members from different Dawson affiliates were introduced and their roles explained.  *See* Tab 6a, PI Appx 2097, 2100, 2108; Tab 9a, PI Appx 2833-2837.  The defendant argues that these factors provided DHS with enough information to credit Dawson with its affiliates' experience under the solicitations' evaluation factors.

Dawson responds to the plaintiff's reliance on *Noblis* case by distinguishing it on its facts.  Dawson argues that *Noblis* involved a situation in which the solicitation was silent about

---

[3] The defendant noted during oral argument that because it understood the plaintiff to be protesting only phase II of the award process, when factors 2-5 were evaluated, the administrative record for this motion does not include any documents pertaining to phase I, during which Factor 1 was evaluated.  Only the record provided can be reviewed, and this analysis does not preclude the defendant from providing a more extensive record for consideration on motions for judgment on the administrative record.

affiliate or subcontractor past performance, which Chief Judge Solomson dubbed "Permutation Four: The Silent Solicitation Default Rule." *Noblis*, 2026 WL 851951 at *25-26.

The solicitations here expressly contemplated and permitted the consideration of affiliate past performance.  The solicitations specifically provided that past performance of any critical subcontractor, parent, or affiliated or predecessor company to an offeror could be considered in evaluating past performance.  Tab 1zp § M.2.  Section L of the solicitation further allowed offerors to submit additional past performance information for affiliates, if the proposal demonstrated that the affiliate's resources would affect contract performance.  Tab 1zm § L.16 at 1175; *see also* Tab 3 at 1227.  The solicitation required offerors to show that the parent or affiliate would have meaningful involvement in the contract.

Due to these elements of these two solicitations, Dawson argues that this case reflects Chief Judge Solomson's "Permutation Three: The Committed Teaming Requirement," in which an affiliate's past performance may be considered if the offer reflects that the affiliate will have meaningful involvement in the performance of the contract.  *Noblis*, 2026 WL 851951 at *24. Therefore, Dawson contends that the general references to its affiliates in its proposals satisfied the terms of the solicitations, and the plaintiff's reliance on *Noblis* is misplaced.

It is arbitrary and capricious for an agency to credit an offeror for the past performance of its affiliates if the proposal does not explain how those affiliates will be meaningfully involved in contract performance.  *Noblis*, 2026 WL 851951 at *27; *Advanced Mgmt. Strategies Grp.*, 139 Fed. Cl. at 417.  Even under *Noblis*'s "Permutation Three," an agency may only credit an offeror for the past performance of the offeror's affiliates if the offer demonstrates that those affiliates will have a significant, committed role in the contract.  *Noblis,* 2026 WL 851951 at *24.  A solicitation may allow an agency to rely on the past performance of an offeror's affiliates in evaluating an offer, but to do so the offer must reflect some evidence of the terms of the agreement between the offeror and those affiliates and provide specific details about the affiliates' participation in the performance of the contract.  Vague or general references in the offer to the offeror's affiliates are insufficient to show that their experience will have a meaningful impact on contract performance by the offeror.  *See IAP World Servs., Inc.*, B-407917.2, 2013 CPD ¶ 171, 2013 WL 3817472, at *7.

For the facilities-operation contract, Dawson provided six past performance examples for projects covering all functional areas of the contract and claimed to have performed each one itself.  AR Tab 6c at 2192-2211.  The record reflects, however, that each of these contracts was performed instead by Dawson's affiliates: Dawson Technical Inc. performed one contract (AR Tab 11 at 2946); D7 LLC performed a second contract (*id*); Dawson Solutions LLC performed a third contract (*id*. at 2947); Dawson Enterprises LLC performed two other contracts (*id*.); and Aktarius LLC performed the sixth contract.  (*Id*.)  Thus, the past performance claimed by Dawson to support its facilities offer was attributable entirely to Dawson's affiliates, not Dawson itself.

Similarly, for the student-services contract, Dawson provided six projects for its past performance, asserting that it had performed two of them.  AR Tab 7c at 2478-97.  The other four projects were attributed to proposed subcontractors.  Of the two projects Dawson claimed as

its own, only one ([* * *]) was performed by Dawson; the other ([* * *]) was performed by Dawson Technical Inc., an affiliate.  AR Tab 15 at 2975; AR Tab 19zi at 3604.

The entirety of Dawson's explanation of how its affiliates will participate in the two contracts is limited to a statement on the cover page of the past-performance sections of its offers, which reads:

[* * *]

AR Tab 6c at 2191; AR Tab 7c at 2477.

This language fails to specify which of its affiliates will participate in performing the contracted work, which key personnel from those affiliates will be assigned to the performance of which tasks under either contract, or what resources, if any, those affiliates will provide. There are stray references in the record identifying the roles of affiliates.  For example, Dawson's affiliate [* * *].  AR 9a at 2835, 2847.  Dawson's proposal in this record does not otherwise tie any specific affiliate to a particular task or responsibility under either contract. The generic language in Dawson's offer does not explain how the experience or past performance of any of the participating affiliates will benefit the performance of the contracts at issue.  Nowhere does either offer specify the mutual obligations of any affiliate to Dawson, either generally or as to the specific performance of these contracts.  Indeed, the affiliates on whose experience Dawson relies are not clearly identified anywhere in Dawson's proposal.  Dawson's offers merely aggregate the entire corporate family under the single name "DAWSON," without distinction, and propose that the whole team will be available to support the work under the contracts.

Given the generalized nature of the role and responsibilities of its affiliates outlined in Dawson's proposal, there is no meaningful way DHS could have evaluated Dawson's past performance and applied it to its evaluation of Dawson's offers.  Some flexibility is due to an agency evaluating offers and making determinations, but to do so an agency must have at least a bare minimum of facts on which to make an informed decision.  Here, no such facts exist. Perhaps if Dawson had at least explained the relationships among its affiliates and spelled out which affiliate would perform which task DHS could have made an informed decision.  Perhaps Dawson's affiliates do operate as a single team, but even that is not evident from the offers, aside from the marketing pablum quoted above.  This record does not support DHS's confidence levels for Dawson's prior experience or past performance.

The defendant's argument that Dawson introduced its team in its oral presentation is also inadequate to salvage DHS's evaluations of prior experience and past performance.  The capabilities of key personnel were evaluated under Factor 3, not under either Factor 1 or Factor 4.  The record does not reflect that DHS considered key personnel when evaluating prior experience or past performance.  *See* AR Tab 11 at 2941-42.  Indeed, the objectives of Factors 1 and 4 were to demonstrate that an offeror had successfully executed contracts of a similar size and nature in the past.

During the oral presentations, Dawson's key personnel did not identify their role with any affiliate, appearing simply as part of Dawson's team.  The record includes no evidence that DHS

11

understood who from Dawson's affiliates would be meaningfully involved in any particular aspect of either of the contracts. *See* AR Tab 11; AR Tab 13; AR Tab 15; AR Tab 17 (lacking any discussion whatsoever of Dawson's key personnel). Even if the record was not so barren, DHS would not benefit. An agency may rely on personnel from an offeror's affiliate to evaluate an offeror's key personnel, but unless the offeror explains how its affiliates that employ these key personnel will otherwise be involved in the performance of the contract, an agency may not simply treat affiliate personnel as alter-egos of the affiliate itself. Personnel can come and go, but an affiliate would still be responsible for performance. This reality explains why past performance and key personnel are treated as different subjects for an offer and evaluated separately. The effort by the defendant to conflate the two elements must fail.

Dawson's proposals do not provide DHS with enough information to allow for informed judgment. DHS could not have reasonably evaluated either proposal under Factors 1and 4. *See Advanced Mgmt.*, 139 Fed. Cl. at 417.

Having shown that DHS's evaluation of Factors 1 and 4 is arbitrary and capricious, AFIS must next show that it is prejudiced by DHS's error.

To succeed on the merits, a protester must demonstrate a significant and prejudicial error in the procurement process. *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed. Cir. 1996); *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir. 1996). Importantly, a protester does not need to prove that, but for the alleged error, it would have been awarded the contract. *Data Gen.,* 78 F.3d at 1562 (citation omitted). Instead, a protester must establish that it had a substantial chance of receiving the contract but for the error. *Statistica,* 102 F.3d at 1582. This standard requires a protester to show it was within the zone of active consideration. *CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed. Cir. 1983) (citation omitted).

On the current record, DHS could not have reasonably evaluated Dawson's proposal under Factors 1 and 4 because Dawson failed to provide evaluators with sufficient information to make any meaningful assessment. *See Advanced Mgmt.*, 139 Fed. Cl. at 417. Without this necessary information, DHS should have assigned Dawson lower ratings for Factors 1 and 4 in both procurements. As two of Dawson's four non-pricing factor ratings require downgrading, and AFIS has a significant price advantage, AFIS has demonstrated prejudice from the misevaluation of Factors 1 and 4.

### *AFIS's evaluation*

The plaintiff argues that DHS's evaluation of AFIS's proposal under Factor 4 (past performance) for both the student-services and facilities-operation contracts was in error because DHS improperly relied on flawed CPARs to evaluate AFIS's past performance. According to AFIS, AFFS submitted a rebuttal to the negative CPARs, but DHS did not consider those rebuttals. As DHS did not consider those rebuttals, AFIS argues the assessment lacks a rational basis.

DHS is neither required to accept the explanation for the adverse CPARS evaluation, nor precluded from considering the CPARS evaluation when assessing past performance. *See, e.g., Colonial Press Int'l, Inc. v. United States*, 788 F.3d 1350, 1359 (Fed. Cir. 2015) ("Merely

12

because some explanation was provided for [the plaintiff's] late deliveries does not mean the contracting officer was required to accept these explanations, nor did it change [the plaintiff's] historical past performance."). An agency's evaluation of past performance may be based on a "reasonable perception of inadequate prior performance," even if the contractor disputes the facts upon which the past performance evaluation is based. *SDS Int'l v. United States*, 48 Fed. Cl. 742, 756 (2001). AFIS cannot show a likelihood of success on this claim.

## 2. FACTOR 2

The plaintiff raises multiple challenges to DHS's evaluation of AFIS under Factor 2 (oral presentation) for the student-services contract. AFIS contends that it was assigned three weaknesses based on unstated criteria and was erroneously assessed four additional weaknesses. AFIS's claims are plausible, but the transcript of the oral presentation is not sufficiently clear, and AFIS has not met its burden to demonstrate a likelihood of success on the merits at this stage. Resolution of these claims is reserved pending a complete administrative record.

Similarly, the plaintiff challenges DHS's evaluation of AFIS under Factor 2 (oral presentation) for the facilities-operation contract. AFIS asserts that it was assigned three weaknesses for unstated criteria and was mistakenly assessed with an additional weakness. Because the administrative record lacks a transcript of AFIS's oral presentation for this contract, it is not possible to determine whether these claims have merit at this stage.

AFIS also alleges disparate treatment in the evaluation of Factor 2 for the student-services contract, arguing that although both Dawson and AFIS committed to daily equipment inspections, only Dawson received a strength for this feature. While both offerors referenced daily inspections, their approaches differed. Dawson's proposal detailed a process for analyzing data trends and tailoring maintenance schedules to optimize equipment performance, which DHS considered a strength for its potential to extend equipment lifecycles. *See* Tab 6a, PI Appx 2122; Tab 10, PI Appx 2938. AFIS's submission merely noted that its team would conduct daily inspections and maintenance on ranges, without describing how these inspections would be managed or anticipated benefits. AFIS has not shown that its presentation was indistinguishable from Dawson's and therefore cannot show disparate treatment. *See Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).

AFIS also alleges disparate treatment by DHS under Factor 2 of the facilities-operation contract, asserting that AFIS was assigned a weakness for the absence of its janitorial manager during the oral presentation, when Dawson was not penalized for the absence of its janitorial manager. DHS assigned AFIS a weakness, noting "[j]anitorial [m]anager was not present for the oral presentation, thus resulting in minimal information of the janitorial plan for requirement." Tab 10 at 2937. AFIS was assigned a weakness not from the absence of its manager but from the lack of substantive information it provided. By contrast, although Dawson's janitorial manager was also absent from the oral presentation, Dawson provided detailed information, earning a strength. *See* Tab 10 at 2939. The record shows that Dawson's presentation was far more detailed than that of AFIS. AFIS has not demonstrated disparate treatment.

### 3. FACTOR 3

AFIS argues that under the Student Services contract AFIS was erroneously assigned a weakness for its program manager not meeting the years of experience or required dining experience. Further, Dawson's program manager did not meet the requirements needed but it was assigned a strength. Similarly, under the Facilities contract, AFIS argues it received a weakness for its senior Heating/Ventilation/Air Conditioning ("HVAC") Technician not having the required certification, but AFIS noted in its proposal that its HVAC Technician would receive the certification within six months of the contract start date. AFIS also argues that DHS erroneously assigned a weakness to its environmental safety manager for not having any relevant experience. Lastly, AFIS argues that Dawson's grounds-maintenance manager did not meet the minimum years of experience required but Dawson was not assessed a weakness for it. These claims involving key personnel are not especially strong; even if AFIS is correct about them, they are insufficient to support a preliminary injunction because they do not, even combined, call into question DHS's overall rationales for Factor 3. They will be resolved on the parties' cross-motions for judgment on the administrative record, after a full administrative record is produced.

### 4. FACTOR 5

AFIS makes two arguments on the price evaluations. First, it argues that DHS's evaluation of Dawson's proposed pricing for both contracts was unreasonable. Second, it argues that the the best-value tradeoff analysis for each contract was arbitrary and capricious because it was based on the flawed underlying evaluation of the other factors.

The crux of AFIS's challenge to DHS's evaluation of Dawson's pricing is a flawed price reasonableness analysis. A price reasonableness analysis is designed "to protect the public from paying a price that is too high for what is being procured." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1311 (Fed. Cir. 2021). Determining a reasonable price "is a judgment based on the specifics of the government's needs." *Id*. Therefore, "'agencies enjoy wide latitude'" when evaluating price reasonableness. *Id*. (quoting *Agile Defense, Inc. v. United States*, 959 F.3d 1379, 1385–86 (Fed. Cir. 2020)).

For both contracts, DHS performed an analysis of the various elements of Dawson's pricing proposals. They are not the most detailed analyses ever seen, but they address the salient aspects of Dawson's proposals. For both contracts, DHS also concluded that the higher price of Dawson's proposals was justified and provided best value to the government. Given the latitude agencies enjoy in evaluating price reasonableness, DHS's analysis of Dawson's price on both contracts is satisfactory. (Tab 13 at 2963; Tab 17 at 2988.)

DHS also compared Dawson's proposed prices to the IGE for each contract and found that the technical strengths and soundness of Dawson's proposals supported the conclusion that its proposed pricing was reasonable, and the proposals justified the price premium. Under the FAR, an agency has "discretion to choose the test it uses when conducing a price reasonableness analysis to ensure that the agency pays a fair and reasonable price." *See DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1316 (Fed. Cir. 2021). DHS used its discretion and documented a rational basis for its decision.

14

The challenge to DHS's evaluation of Dawson's pricing is rejected.

As for AFIS's challenge to the best-value trade-off decisions, it is derivative of and dependent on AFIS's other claims. *See IT Enter. Sols. JV, LLC v. United States*, 132 Fed. Cl. 158, 174 (2017). Resolution of this claim is reserved for the motions for judgment on the administrative record, when the unresolved arguments presented by AFIS are addressed.

### 5. AGENCY NEGOTIATIONS

The plaintiff argues that DHS awarded Dawson contracts for requirements that differed from those solicited and improperly conducted negotiations with Dawson alone regarding the changed requirements.

Dawson's president acknowledged on March 5, 2026, prior to contract award on March 6, 2026, that his company had been negotiating with DHS over the contracts. (ECF 1-1 at ¶¶ 5,7.) According to the plaintiff, these negotiations included Dawson and DHS working together to "substantially revise[] the structure, requirements, and proposed pricing for both contract." (ECF 26-1 at 36.) The pricing for the awarded contracts is higher than the pricing Dawson had proposed. AFIS argues that the contracts DHS awarded do not match the requirements DHS solicited, reflecting an unfair bidding process because not all offerors were given the opportunity to bid on common requirements transparently advertised to them.

The defendants argue that the source-selection decisions were made on February 12, 2026. At that point, Dawson was the awardee of the contracts, even though they were not formally awarded until March 6, 2026. Discussions with Dawson only began after February 26, 2026, when FLETC received the DHS memorandum directing the termination of all ASRC contracts. The defendants represent that the discussions did not involve substantial revisions to the contracts. Compare Tab 1a, PI Appx 1-19, with Tab 25, PI Appx 3687-700. They argue that the objective of the negotiations was to accelerate the awardee's transition period to accommodate the February 26 memorandum directing FLETC to terminate the incumbent contract early. The defendants argue that an agency is permitted to communicate with an incoming contractor prior to award to ensure there is no lapse in services.

None of the post-negotiation contract changes constitute a substantive alteration to the contracts' requirements. The topics of the negotiations, reflected in the document Dawson provided to DHS (AR Tab 24), were primarily dedicated to aligning contract language with the terms of the solicitation, removing outdated FAR clauses, and adjusting the transition period. While the plaintiff contends that the contract price increased following these discussions, any price changes appear to be tied to two exceptional circumstances: the decision to shorten the transition period and the lapse of appropriations for DHS. A comparison of Dawson's pricing proposals to the values of the contract line items ("CLINS") reveals either no change or only minimal adjustments that reflect minor modifications attributable to the expedited transition, not a fundamental repricing.

The plaintiff also challenges the inclusion of a clause providing that:

the Contractor's execution of this award and any commencement of performance shall not constitute a waiver of the Contractor's right to seek a bilateral modification

and/or submit a priced request for adjustment (REA or similar) for Government-directed acceleration, immediate-start work, or scope deltas beyond the mutually agreed baseline.

AR Tab 25 at 3699; AR Tab 26 at 3865.

Although AFIS characterizes this provision as a "blank check" for Dawson to alter the contract price, such provisions are reflected in the FAR and are standard in government contracts, preserving the contractor's right to seek additional compensation for government-directed changes.  FAR 43.103.  This addition does not represent a material change to the solicitation.

Even assuming that the contract was materially changed, AFIS cannot establish prejudice.  AFIS claims its pricing for the alleged changed requirements would have been even more competitive than its pricing for the solicited requirements. (ECF 26-1 at 37-38.)  The record belies this argument.  DHS fully considered AFIS's incumbent status and the pricing advantages that status provided but still did not select AFIS.  The student-services contract evaluation noted: "Incumbent experience at the FLETC site supports a seamless transition with no lag in service; personnel familiar with FLETC operations."  Tab 14 at 2968.  The price evaluation similarly noted: "Phase-in cost = $0.00; Incumbent."  Tab 16 at 2982.  The facilities-operation contract evaluation similarly recognized AFIS's incumbent status.  Tab 10 at 2936-37; Tab 12 at 2955.  The Source Selection document expressly acknowledged AFIS's institutional knowledge of FLETC Charleston.  Tab 13 at 2961.  Because AFIS's pricing and incumbent advantages were already fully considered and found insufficient, AFIS cannot demonstrate prejudice from not being included in discussions that produced the challenged contract modifications.  When "there is no evidence that the [agency's] award decision would have changed, . . .  it is unlikely [a] court will find prejudice." *Candle Corp. v. United States*, 40 Fed. Cl. 658, 665 (1998).  Accordingly, the plaintiff cannot show it is likely to succeed on this claim.

## B.  IRREPARABLE HARM

The plaintiff argues that it will suffer irreparable harm if a preliminary injunction is not issued.  Central to these arguments is the competitive advantage the plaintiff loses if the transition to Dawson takes place.  AFIS argues that it offers a fully staffed, highly trained team already in place.  AFIS fears that 30-40 percent of its incumbent staff, including two key personnel who are now employed by AFIS but are listed in the key personnel section of Dawson's offer, will be lost if the new contract proceeds.  AFIS argues that if it were to succeed on the merits and then win the contracts after re-evaluation of the proposals, the harm to its competitive advantage as the incumbent and its inability to transition back into performance of the new contracts with its current staff would constitute irreparable harm.

The defendant argues that AFIS's argument is the same argument any incumbent would experience upon the loss of a successor contract.  Further, the primary support cited by the plaintiff identifies as irreparable harm only the loss of "key personnel," not merely some of its incumbent staff.  *See NetStar-1 Government Consulting, Inc. v. United States*, 98 Fed Cl. 729, 735 (2011).  The defendant argues AFIS has not shown a likely loss of its key personnel.

An injunction is inappropriate when "the harms alleged by plaintiff are the sorts of things that any incumbent would experience upon the loss of a successor contract." *CRAssociates, Inc. v. United States*, 103 Fed. Cl. 23, 26 (2012). "No federal contractor has a right to maintain its incumbency in perpetuity. It follows, a fortiori, that the potential loss of the benefits of incumbency does not give plaintiff some sort of automatic right to a stay pending appeal." *Id*. Specifically, an incumbent who loses employees because of a contract award loss does not automatically receive injunctive relief. In *PGBA, LLC v. United States*, Judge Lettow noted that although the loss of employees causes "significant" harm, an incumbent contractor's "reliance on the loss of its current employees as a basis for irreparable injury would require this Court to consider any incumbent contractor's loss of a successor contract to be irreparable harm." 60 Fed. Cl. 196, 221, *reconsideration denied*, 60 Fed. Cl. 567, *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).

The plaintiff's loss of approximately 30-40 percent of its workforce and the competitive advantage that comes with being an incumbent is not sufficient to show irreparable harm. While the loss of two "key personnel" edges the plaintiff closer to a showing of irreparable harm, the plaintiff has failed to show it will not get those two employees back upon being awarded the contract, or that it would be unable to find employees of a similar skill set to fill those key spots.

The purpose of a preliminary injunction is "to protect the plaintiff from irreparable injury and to preserve the [ ] court's power to render a meaningful decision after a trial on the merits." *Canal Authority of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). In essence, a preliminary injunction ensures that the court can issue the relief sought and make the plaintiff whole, regardless of how much time passes between the filing of a complaint and the court's decision.

In its complaint, AFIS challenges numerous errors in DHS's evaluation of its proposals and in Dawson's proposals, rendering those evaluations, and the best-value trade-off decisions based on them, arbitrary and capricious. Those challenges can be fully addressed and remedied on cross-motions for judgment on the administrative record. The complaint does not seek relief from harm arising from the transition from the previous contracts. True, if not for the erroneous evaluations, AFIS can argue, there would be no transitions, but that alone is not enough to justify blocking the orderly and routine operations of the agency.

The claim for a preliminary injunction must be evaluated through the lens of the claims raised in the complaint. Here, those claims can be remedied and complete relief through a reevaluation awarded if the plaintiff prevails on the merits. Extraordinary preliminary relief is not required to enable the plaintiff to be afforded the relief it seeks.

AFIS has shown it is likely to prevail on the current record on its claims under Factors 1 and 4, but if the record remains as it is, the remedy for the agency's arbitrary and capricious evaluations of those factors can be remedied in full in conjunction with a final decision on AFIS's other claims. Preliminary relief is not appropriate when the remedy would be a remand for reevaluation of both parties' sets of offers. Otherwise, AFIS has not shown that it is losing more than its competitive advantage as an incumbent, which cannot support a claim of irreparable harm.

## C.  THE BALANCE OF HARMS

The defendant argues that the harm, both operational and financial, to DHS from an injunction would be significant.  FLETC has already expended approximately $3,000,000 in transitioning services to Dawson over the last month, and this sum would be lost if the transition were enjoined.  (28-1 at ¶ 21.)  It would cost approximately $2,000,000 monthly if FLETC were enjoined from proceeding with the transition and required to extend the existing contract.  *Id*.  The defendant also argues that a preliminary injunction would harm FLETC's ability to fulfill its mission, as the uncertainty will make it hard to fill positions and perform maintenance.

Dawson argues that it will be harmed from an injunction.  It is currently working towards the transition of services to Dawson.  A work stoppage would result in disruptions to Dawson's workforce, causing material, service, and labor inefficiencies and strained vendor relationships.  Dawson would be forced to divert personnel from other business developments.  (ECF 29-3.)  Dawson also asserts that while that cost from delay could be recouped through an equitable adjustment, a delay would require Dawson to rely on a line of credit, which would otherwise be used for other purposes.  *Id*.

On this record, the defendants would suffer more from an injunction.  AFIS can have any errors corrected and the competitive balance restored through a successful motion for judgment on the administrative record.  It will have lost nothing (although the current contractor, AFFS, will be harmed financially, it is not party to this suit).  The disruption to the defendants from an injunction at this stage would be substantial.  That harm may be even more substantial if AFIS prevails in this litigation at a later stage, and the defendants will not be heard to argue that the balance of harms for a permanent injunction is substantial because Dawson has been performing for several months.  That will be the defendants' burden to bear at that time.  This factor supports the denial of the preliminary injunction.

## D.  PUBLIC INTEREST

AFIS argues that the public's interest "in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid."  *NetStar-1*, 98 Fed. Cl. at 735 (quoting *PGBA*, 57 Fed. Cl. at 663).  The plaintiff relies primarily on a DHS memorandum distributed internally directing agency components to terminate all contracts with ASRC affiliates, like ASIF.

The defendant argues that FLETC will be harmed by an injunction.  It argues that the public interest is served by ensuring DHS's law enforcement training facilities can meet the training needs of its students.  A decline in the quality of facilities maintenance or student services could affect the health and safety of trainees, as well as the efficiency and quality of their training.

The public interest is served by ensuring that the new contracts represent the best overall value to the government, and that the procurement process is honest, open, and fair, while minimizing delays and their attendant costs associated.

AFIS relies on emails and references to the DHS memorandum to suggest that the contracting process was biased.  The record is not sufficiently developed to support argument,

18

and the timeline undercuts it, as the decision to award the contracts to Dawson predate the memorandum. If the record reflected that the DHS directive had influenced or interfered with the evaluation of the offers at issue or with the awards to Dawson, the public interest in preserving the integrity of the competitive process would strongly favor the plaintiff. The record, as it currently exists, belies the claim.

As AFIS has not shown that the procurement process was corrupted or biased, the public interest favors the regular order. Dawson prevailed in the competition. Unless AFIS can show error in the competition, and it may still do so, the public interest does not support an injunction.

## VI.    CONCLUSION

AFIS has failed to show a likelihood of success on the merits of some of its claims; on others, it may still prevail on a fuller record, but the record at this stage does not permit a finding that it is likely to prevail. AFIS has shown on this record that it is likely to succeed on its claim that the evaluations of Dawson's proposals under Factors 1 and 4 were arbitrary and capricious. AFIS cannot show, however, that it will be irreparably harmed by this error, as it can be remedied by requiring DHS to reevaluate the proposals and conduct a new best-value determination with the revised ratings. If AFIS prevails on its motion for judgment on the administrative record, the agency will be required to reevaluate the existing proposals. That remedy can offer AFIS the relief it seeks. The motion for a preliminary injunction is denied.

s/ Richard A.  Hertling

**Richard A.  Hertling**
**Judge**

19